## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MICHAEL KOSMIN, | ) Civ. No.07-00059 ACK-LEK |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| CENTEX HOMES; and DOE DEFENDANTS | ) |
| 1-100, | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

On December 12, 2006, Michael Kosmin ("Plaintiff") filed a Complaint against Centex Homes ("Defendant") in the Circuit Court of the First Circuit, State of Hawaii.  On January 19, 2007, Plaintiff filed a First Amended Complaint,[1] alleging breach of contract, anticipatory breach of contract, and intentional infliction of emotional distress.

On February 5, 2007, Defendant removed the action to the U.S. District Court for the District of Hawaii.

On September 5, 2007, Plaintiff filed a Second Amended

_____

[1] Plaintiff's original complaint named "Centex Corporation dba Centex Homes," a non-existent entity, as Defendant.  See Defendant Centex Homes' Memorandum in Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint Filed August 2, 2007, at 3 (Aug, 17, 2007).

1

Complaint in this Court, adding a claim for breach of the covenant of good faith and fair dealing and subsequent bad faith.[2]

On January 4, 2008, Defendant filed the instant Motion for Summary Judgment ("Motion").[3]  On the same day, Defendant filed a Separate Concise Statement of Material Facts in Support of Motion for Summary Judgment ("Motion CSF").  Defendant attached the January 4, 2008 declaration of its attorney, Wesley M. Fujimoto, which authenticates exhibits 1-5 as true and correct copies of the original documents.  Defendant also attached the December 26, 2007 declaration of Bruce Sloan ("Sloan Decl."), President of the Hawaii Division of Centex Destination Properties of Centex Destination Properties ("Hawaii Division"), which authenticates exhibit 4 as a true and correct copy of Plaintiff's W-2 form for the year 2006.  On January 9, 2008, Defendant filed a Supplemental Declaration of Wesley M. Fujimoto to provide a redacted copy of exhibit 4 and to add as exhibit 6 true and correct copies of excerpts of the transcript of Plaintiff's

_____

[2] Plaintiff also amended the jurisdiction section to note that the Court has proper jurisdiction under 28 U.S.C. § 1332 and that venue is proper under 28 U.S.C. § 1391.  See Order Granting Plaintiff's Motion for Leave to File Second Amended Complaint, Civ. No. 07-00059 ACK-LEK at 2 (Aug. 20, 2007).

[3] The Court notes that Defendant first filed its Motion for Summary Judgment and Concise Statement of Material Facts on January 2, 2008.  However, both pleadings were withdrawn and subsequently re-filed on January 4, 2008 to comply with electronic filing requirements.

deposition.

On February 28, 2008, Plaintiff filed a Memorandum in Opposition to Defendant Centex Homes' Motion for Summary Judgment ("Opposition").  Plaintiff also filed a Concise Statement of Facts in Opposition to Defendant Centex Homes' Motion for Summary Judgment ("Opposition CSF").  Plaintiff attached his own declaration ("Kosmin Decl.") and the February 28, 2008 declaration of his attorney, Michael Jay Green, which authenticates that exhibits A-F are true and correct copies of the original documents.[4]

On March 5, 2008, Defendant filed a Reply Memorandum in Support of its Motion for Summary Judgment ("Reply").

The parties appeared before this Court to address Defendant's Motion on March 19, 2008.

## **FACTUAL BACKGROUND**[5]

In June of 2003, Defendant Centex Homes hired Plaintiff Michael Kosmin to be the Director of Sales and Marketing for the Hawaii Division.  Second Am. Comp. ¶ 7; Def. Exh. 1.  Plaintiff's job title later changed to Vice President of Sales and Marketing

---

[4] Copies of Plaintiff's declaration and his attorney's declaration were also attached to Plaintiff's Opposition.

[5] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

for the Hawaii Division.  Second Am. Comp. ¶ 8; Motion CSF ¶ 2;[6]
Kosmin Depo. at 61-62.  In both positions, Plaintiff was
responsible for managing the Sales Executives and Sales Managers
in the Hawaii Division.  Motion CSF ¶ 2.  Plaintiff's employment
was at-will.  Motion CSF ¶ 1.

Prior to starting the job, Plaintiff received and
signed a letter, dated June 20, 2003 ("Letter Agreement").
Motion CSF ¶ 3.  The Letter Agreement contained the terms and
conditions of Plaintiff's employment.  Id.  The Letter Agreement
stated, in relevant part:

> Please find below a summary of the terms of your
> employment, and certain benefits that we will provide to
> you while you are employed.
> *  *  *
> 3.  Your base salary will be $175,000 per year.  Salary
>     reviews are performed annually at the beginning of
>     each fiscal year (April 1).  All Centex Destination
>     Properties employees are to be paid bi-monthly.
> 4.  Additional compensation will be available to you
>     through an over-ride incentive based 0.25% of
>     Division sales revenue.  The current sales revenue
>     will be generated through lot and condominium sales
>     in Kolea. . . . Over-ride incentives are paid at
>     closing on lot sales.  Over-ride incentives for
>     condominium sales are paid 50% upon firm sale with
>     the balance paid upon close of escrow.
> 5.  Additional revenue achieved from future
>     neighborhoods will be added to the incentive
>     calculation outlined above at 0.1% to 0.25%
>     depending on expected sales volumes produced.
> *  *  *
> 11. Like me and most other employees of Centex, you
>     will remain an "employee at will," which means that

---

[6] The Court refers to the facts in the Motion CSF in the
order in which they appear, although the facts are not numbered
in the original.

> you may resign or be terminated at any time.  This is not an employment contract or a guaranty of continued employment for any period and we will not enter into an employment contract.

Def. Exh. 1.  The Letter Agreement also provided that Plaintiff would have use of a company vehicle, be admitted into the company 401(k) plan, and receive other employment and vacation benefits. Id.

On June 15, 2006, Plaintiff was terminated from his job following an investigation of allegations that he sexually harassed a former sales executive.  Motion CSF ¶ 8.  According to Plaintiff, he was asked to resign but refused.  Opposition CSF ¶ 8.  As a result, he was terminated without cause.[7]  Id.  At the time of his termination, Plaintiff was paid the salary and vacation that he had earned for that pay period, as well as some override commissions.[8]  Motion CSF ¶ 10; Opposition CSF ¶ 10. Plaintiff was notified that he would not receive any further compensation beyond June 30, 2006.  Second Am. Comp. ¶ 14.  At that time, Plaintiff also turned in his company-issued vehicle, computer, and cell phone.  Motion CSF ¶ 11.

According to Plaintiff, the override[9] incentive payment

---

[7] At the hearing, Defendant conceded that Plaintiff's termination was without cause.

[8] At the time of his termination, Plaintiff was paid around $20,000 in overrides.  See Pl. Exh. A. at 1.

[9] An "override" is defined as a "commission paid to a manager on a sale made by a subordinate." Black's Law Dictionary

5

schedule outlined in his Letter Agreement had been modified over time to mirror the commission intervals for sales executives. Opposition ¶ 10; see also Sloan Depo. at 154.  Specifically, Plaintiff states, and Defendant agreed at the hearing, that at the time of his termination, Plaintiff had been receiving overrides for units sold by the Hawaii Division according to the following payment schedule:

> a) 25% of the commission of the sale of a unit was due after the end of the sales rescission period for the unit.
> b) 25% of the commission on a sale of a unit was due one hundred and twenty days after the sales contract was written.
> c) 25% of the commission on a sale of a unit was to be paid at closing.
> d) 25% of the commission on a sale of a unit was to be paid after JD Power survey scores came in at or higher than the division standard of 9.0 on a scale of 1 to 10.

Second Am. Comp. ¶ 16; Kosmin Decl. ¶ 5.

Plaintiff further claims that while he was employed as Vice President of Sales and Marketing, he directly participated in modifying the commission schedules for sales executives and sales managers.  Opposition at 4.  Plaintiff points to an old version of a document titled "Summary of Compensation Policies and Key Responsibilities for Sales Executives," dated December 29, 2003 ("Old Sales Executive Agreement").  See Pl. Exh. C. at 3.  Paragraph 1.6 of the Old Sales Executive Agreement provides that commissions would be paid 50% upon the expiration of any

---

1136 (8th ed. 2004).

rescission period and 50% upon the closing of the sale.  _Id._  In
paragraph 1.8, the Old Sales Executive Agreement also sets out
various reductions in commissions that would occur if a Sales
Executive was terminated for cause, resigned or was terminated
without cause, or was transferred.[10]  _Id._ at 3-4.

     In a newer version of the "Summary of Compensation
Policies and Key Responsibilities for Sales Executives," dated
January 12, 2005 ("New Sales Executive Agreement"), paragraph 1.6
was modified to reflect the four-part override payment schedule
discussed above.  _See_ Pl. Exh. D at 3.  Paragraph 1.7 states that
if a commission is advanced to a Sales Executive and the closing
of the property does not ultimately occur, that Sales Executive
will be charged back for any advanced excess commission.[11]  _See_
_id._  Further, paragraph 1.8 provides that a Sales Executive who

---

     [10]  Specifically, paragraph 1.8.1 of the Old Sales Executive
Agreement provides that Sales Executives who are terminated for
cause shall not earn or be paid any commissions for sales that
close after the date of termination.  _Id._  Paragraph 1.8.2 states
that if a Sales Executive resigns or is terminated without cause:
(a) commissions on sales which close more than sixty days
afterwards are earned at a rate of 100% of the total commission;
and (b) commissions on sales which close more than sixty days
afterwards are earned at a rate of 50% of the total commission.
_Id._  Paragraph 1.8.3 states that Sales Executives who are
transferred to other communities within the same division earn
85% of the total commissions on sales which close after transfer,
and Sales Executives who are transferred to other divisions earn
50% of the total commission on sales which close after transfer.
_Id._

     [11] The Old Sales Executive Agreement also contained a
charge-back provision at paragraph 1.7.  _See_ Pl. Exh. C. at 3.

is terminated for cause is not entitled to any commissions on sales that close after the date of termination.  Id.  However, a Sales Executive who resigns or is terminated without cause earns commissions according to the following schedule: (a) commissions on sales which close within fifteen days after resignation or termination without cause shall be earned at a rate of 100% of the total commission; and (b) commissions on sales which close more than fifteen days after resignation or termination without cause shall be earned at a rate of 50% of the total commission. Id.  Plaintiff did not sign either version of the Sales Executive Agreement.  Motion CSF ¶ 21; Opposition CSF ¶ 21.  However, Plaintiff was evidently being paid according to paragraph 1.6 of the New Sales Executive Agreement, as discussed infra.

        This dispute arose over whether Plaintiff was entitled to override commissions on sales contracts that were signed before he was terminated but that closed after he was terminated. Plaintiff contends that Defendant's refusal to pay post-employment overrides for contracts that were signed prior to his termination directly contradicts the terms of the Letter Agreement and the practice under which he had previously been compensated.  Second Am. Comp. ¶ 15; Kosmin Decl. ¶¶ 7, 8. Defendant argues that Plaintiff is not entitled to post-employment overrides because the Letter Agreement does not

provide for the payment of post-employment overrides.[12]   Motion

CSF ¶¶ 12, 13, 14, 15.

## STANDARD

The purpose of summary judgment is to identify and

dispose of factually unsupported claims and defenses.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary

judgment is therefore appropriate if the "pleadings, the

discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56©.

"A fact is 'material' when, under the governing

substantive law, it could affect the outcome of the case.  A

'genuine issue' of material fact arises if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving

---

[12] Defendant claims that the override incentives operated as
a bonus that was based on the Hawaii Division's overall revenue,
not a commission.  Id. ¶ 6.  Plaintiff did not have a broker's
license at any time during his employment, but he did receive a
real estate license at the end of his employment with Defendant.
Id. ¶ 7; Opposition CSF ¶ 7.  Defendant argues that the fact that
Plaintiff was not a licensed broker or real estate agent meant
that he was not permitted to collect commissions on real estate
sales.  Motion CSF ¶ 7.  Plaintiff disputes this characterization
and asserts that the override incentives were additional
compensation, not a bonus.  Opposition CSF ¶ 6.   Plaintiff
claims that Defendant had a separate bonus pool plan that
addressed bonuses.  Id.  The Court adds that Defendant's
assertion that Plaintiff was not permitted to collect commissions
on real estate sales directly contradicts the language in item
four of the Letter Agreement.

party.'"   Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav.
Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation
omitted).[13]   Conversely, where the evidence could not lead a
rational trier of fact to find for the nonmoving party, no
genuine issue exists for trial.   See Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing
First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

     The moving party has the burden of persuading the court
as to the absence of a genuine issue of material fact.   Celotex,
477 U.S. at 323; Miller v. Glenn Miller Productions, 454 F.3d
975, 987 (9th Cir. 2006).   The moving party may do so with
affirmative evidence or by "'showing'--that is pointing out to
the district court--that there is an absence of evidence to
support the nonmoving party's case."   Celotex, 477 U.S. at 325.[14]

     Once the moving party satisfies its burden, the

---

[13] Disputes as to immaterial issues of fact do "not preclude
summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804
F.2d 1472, 1483 (9th Cir. 1986).

[14] When the moving party bears the burden of proof at trial,
that party must satisfy its burden with respect to the motion for
summary judgment by coming forward with affirmative evidence that
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial.   Miller, 454 F.3d at 987 (quoting C.A.R.
Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d
474, 480 (9th Cir. 2000)).   When the nonmoving party bears the
burden of proof at trial, the party moving for summary judgment
may satisfy its burden with respect to the motion for summary
judgment by pointing out to the court an absence of evidence from
the nonmoving party.   Miller, 454 F.3d at 987.

nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  <u>See</u> <u>Celotex</u>, 477 U.S. 323; <u>Matsushita Elec.</u>, 475 U.S. at 586; <u>Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).[15]  The nonmoving party must instead set forth "significant probative evidence" in support of its position.  <u>T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. <u>See</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 630-31.[16]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  <u>Anderson v. Liberty Lobby,</u>

---

[15] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002); <u>see</u> <u>also</u> <u>T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

[16] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Bator v. State of Hawaii</u>, 39 F.3d 1021, 1026 (9th Cir. 1994).

Inc., 477 U.S. 242, 250-51 (1986).

## DISCUSSION

Defendant moves the Court for summary judgment on Plaintiff's four causes of action: (1) breach of contract; (2) anticipatory breach of contract; (3) bad faith; and (4) intentional infliction of emotional distress.  At the hearing, Plaintiff withdrew his claims for anticipatory breach of contract and intentional infliction of emotional distress.  Plaintiff also withdrew his request for punitive damages.  The Court discusses the merits of each remaining claim in turn.

## I.   Count I: Breach of Contract

Defendant first argues that Plaintiff's breach of contract claim must fail because Plaintiff has not identified any contract that would entitle him to post-employment overrides.  At the same time, Defendant references the terms of the Letter Agreement to support its argument that Plaintiff was only entitled to override incentives while he was employed.  Plaintiff relies upon the same Letter Agreement to reach the opposite conclusion, arguing that not only is the Letter Agreement clearly a contract, but its terms do not limit the payment of overrides to the duration of employment.

Under Hawaii law, a contract "requires an offer and acceptance, consideration, and parties who have the capacity and authority to agree as they do."  In re Doe, 90 Haw. 200, 208, 978

P.2d 166, 174 (1999) (quoting <u>Dowsett v. Cashman</u>, 2 Haw. App. 77, 83, 625 P.2d 1064, 1068 (1981)).  In addition, "'[t]here must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract.'"  <u>Carson v. Saito</u>, 53 Haw. 178, 182, 489 P.2d 636, 638 (1971) (quoting <u>Honolulu Rapid Transit Co. v. Paschoal</u>, 51 Haw. 19, 26-27, 449 P.2d 123, 127 (1968)).

     The Court finds it incongruous of Defendant to insist on one hand that no contract exists because there was no "meeting of the minds" regarding post-employment overrides, yet on the other hand argue that the language of the Letter Agreement explicitly restricts the payment of overrides to the term of employment.  Indeed, at the hearing, Defendant conceded that the Letter Agreement was a contract, but maintained that it was a contract that did not provide for post-employment overrides.[17] Accordingly, the Court construes the Letter Agreement as a contract.[18]

     When interpreting a contractual provision, the Court's

---

[17]  Despite this admission, Defendant insisted at the hearing that it could unilaterally change the provisions of the Letter Agreement at any time because Plaintiff was an at-will employee.

[18] The Court notes that the Letter Agreement expressly states that it is not an "employment contract." Def. Exh. 1. However, this statement immediately follows the characterization of Plaintiff as an "employee at will" and the statement that the offer letter does not create a guaranty of employment for any fixed duration.  <u>See</u> <u>id.</u>

goal is to determine the intention of the parties. <u>Pancakes of</u> <u>Hawaii, Inc., v. Pomare Prop. Corp.</u>, 85 Haw. 300, 944 P.2d 97 (Haw. App. 1997). "When the terms of a contract are definite and unambiguous there is no room for interpretation." <u>See</u> <u>Hanagami</u> <u>v. China Airlines, Ltd.</u>, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984) (quoting <u>Hackfield and Co. v. Grossman</u>, 13 Haw. 725, 729 (1902)). However, if the parties use language that "leaves some doubt as to the meaning and intention," then the court will "apply the rules of construction and interpretation in an effort to ascertain the intention of the parties to the contract." <u>Id.</u>; <u>see</u> <u>also</u> <u>Amfac, Inc. v. Waikiki Beachcomber</u>, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992)(observing that contractual provisions should be interpreted "according to their plain, ordinary and accepted use in common speech").

## A.   Ambiguity of the Letter Agreement

The Court first considers whether the Letter Agreement is ambiguous with respect to the payment of post-employment overrides. The Court acknowledges that it should "look no further than the four corners of the document to determine whether an ambiguity exists." <u>State Farm Fire & Cas. Co. v.</u> <u>Pacific Rent-All, Inc.</u>, 90 Haw. 315, 324, 978 P.2d 753, 762 (1999). In their briefs, both parties insist that the language of the Letter Agreement is crystal clear in a way that supports their respective positions. At the hearing, however, Plaintiff

argued that the Letter Agreement was ambiguous.  Reading the
Letter Agreement in its entirety, the Court agrees with Plaintiff
and finds that the Letter Agreement is ambiguous as to whether
override incentives are owed to Plaintiff notwithstanding his
termination.

The introduction to the terms and conditions in the
Letter Agreement provides: "Please find below a summary of the
terms of your employment, and certain benefits that we will
provide to you while you are employed."  See Def. Exh. 1
(emphasis added).  Defendant emphasizes the phrase "while you are
employed," arguing that it unequivocally limits the listed terms
to the period of employment.  Plaintiff, on the other hand, takes
the position that the phrase "while you are employed" only refers
to the listed benefits, not the terms of his employment.  The
letter goes on to list, in items four and five, that "additional
compensation will be available to you" through override
incentives, which, for lot sales, "are paid at closing," and for
condominium sales, "are paid 50% upon firm sale with the balance
paid upon close of escrow."  Id. (emphasis added).

In support of its interpretation, Defendant relies upon
a case decided by the Idaho Supreme Court, Bakkar v. Thunder
Spring-Wareham, LLC, 141 Idaho 185, 108 P.3d 332 (2005).  In
Bakkar, the court found that a plaintiff was not entitled to
post-employment overrides based on language in his contract that

provided for overrides but later stated "this is in affect (sic) only during your term of employment with . . . Thunder Spring." <u>Bakkar</u>, 141 Idaho at 337-38.

The Court finds that the contract in <u>Bakkar</u> differs significantly from the one at hand.  Unlike in <u>Bakkar</u>, the phrase "while you are employed" does not unequivocally apply to the entire contract.  Rather, Defendant placed a comma between the first and second halves of the sentence.  As Plaintiff asserts, this comma could indicate that the phrase "while you are employed" only limits the enumerated benefits to the duration of employment, and does not apply to the provisions regarding override incentives.  The Court finds that the inclusion of the comma injects ambiguity into the Letter Agreement.  Defendant's counsel conceded at the hearing that the Letter Agreement was poorly drafted and that it had to be "put in context."

Moreover, the Court finds that the Letter Agreement is ambiguous because it does not dictate one way or the other as to whether override payments are owed after termination.  One interpretation is that Plaintiff is entitled to overrides for every contract that is signed prior to termination.  Another interpretation is that Plaintiff is only entitled to overrides on sales that closed prior to termination.

Finally, the Court finds that the Letter Agreement is ambiguous because, in item four, it is unclear what "closing"

16

means as opposed to "close of escrow."  Construing the Letter
Agreement in its entirety, the Court concludes that it is
ambiguous because it is subject to conflicting interpretations.

## B.   Genuine Issues of Material Fact

Given the Court's conclusion that the language in the
offer letter is ambiguous, the Court must now conduct a "further
inquiry to determine the intention of the parties."  See Maui
Land and Pineapple Co. v. Dillingham Corp., 67 Haw. 4, 11, 674
P.2d 390, 395.  "The intent of the parties is a question of fact,
and '[i]nasmuch as the determination of someone's state of mind
usually entails the drawing of factual inferences as to which
reasonable men might differ, summary judgment often will be an
inappropriate means of resolving an issue of that character.'"
Hanagami, 67 Haw. at 364 (quoting Bishop Trust Co. v. Central
Union Church, 3 Haw. App. 624, 628-29, 656 P.2d 1353, 1356
(1983)).  The two main issues are (1) whether, as alleged by
Plaintiff, the parties subsequently modified the override
provisions in the Letter Agreement; and (2) when do override
payments vest under the terms as modified?  The Court finds that
genuine issues of material fact exist with respect to both
questions, and therefore denies Defendant's motion for summary
judgment as to Count I, for breach of contract.

### 1.   Modification of the Letter Agreement

The Hawaii Supreme Court has recognized that

17

"subsequent action of the parties in construing the contract cannot be ignored as evidencing the intent of the parties." In re Taxes of Aiea Dairy, Ltd., 46 Haw. 292, 306, 380 P.2d 156, 163 (1963). Although Plaintiff did not sign any of the Sales Executive Agreements, the Court finds that Plaintiff has supplied sufficient evidence to raise questions about Defendant's intent regarding the Plaintiff's entitlement to post-employment overrides. Most significantly, Plaintiff's override payment schedule was modified to mirror paragraph 1.6 of the New Sales Executive Agreement. Defendant concedes that Plaintiff was terminated without cause. Therefore, the Court must question whether the parties similarly intended the contents of paragraph 1.8 to govern the payment of post-employment overrides to Plaintiff.[19]

Plaintiff has also offered evidence that Sloan and possibly Defendant's in-house counsel reviewed and approved modifications to the terms of override payment provisions for sales executives and sales managers to limit commissions in the event of termination. See Sloan Depo. at 156-157. Plaintiff points out that his override incentives were not similarly

---

[19] The Court notes that the modified payment terms potentially disadvantaged Plaintiff as the final 25% payment might never be paid if the purchaser indicated dissatisfaction with the handling of his purchase or failed to respond to the survey, in which case the final 25% would be kept by Defendant.

18

restricted.[20]

        In response, Defendant painstakingly attempts to
distinguish Plaintiff from other Centex employees--Robert Edison,
Gary Bell, and David Camp.  Defendant further tosses out a red
herring by claiming that Plaintiff is not entitled to a severance
package simply because other employees have received them in the
past.  See Motion at 13-14 (citing Brines v. XTRA Corp., 304 F.3d
699 (7th Cir. 2002)).  Finally, Defendant goes to great lengths
to characterize the overrides in the Letter Agreement as
"bonuses," rather than commissions.  In response, however,
Plaintiff has produced evidence suggesting that there was a
different bonus pool plan in place, separate and apart from the
override payment schedule.  See Kosmin Decl. ¶ 5; Def. Exh. 3;
Kosmin Depo. 59-60.  The Court finds that the overrides
referenced in the Letter Agreement are neither severance payments
nor bonuses.

        The Court concludes that Plaintiff has sufficiently
demonstrated that genuine issues of fact exist as to whether
Defendant subsequently modified the Letter Agreement to include

---

        [20] Plaintiff further argues that Sloan admitted in his
deposition that Plaintiff was subject to a charge-back provision
that would require him to pay back a commission if no closing
occurred, even if he was no longer working for the company.  See
Sloan Depo. at 56-57.  However, it is unclear to the Court
whether Sloan was referring to paragraph 1.7 in the New Sales
Executive Agreement or the separate Sales Bonus Plan attached as
Defendant's Exhibit 3.

the payment of post-employment overrides.

## 2.   Vesting of the Right to Share in the Overrides

The Court further finds that a genuine issue of material fact exists as to exactly when Plaintiff earns the right to collect his overrides.  According to Plaintiff, virtually all of his work would have been completed with the signing of a sales contract, even though the sale may not eventually close. Plaintiff was not involved in construction at all.  Thus, Plaintiff claims that his right to override payments vests as soon as a sales contract is signed.  In contrast, Defendant argues that Plaintiff's right to his override payments only vests when that portion is scheduled to be paid.  At the hearing, Defendant explained that this could mean that when a purchaser never responds to the JD Power Survey, Plaintiff's right to the final 25% of the override never vests.  The Court concludes that the parties' disagreement over when Plaintiff's override payments vest constitutes a genuine issue of material fact.

Accordingly, the Court denies Defendant's Motion for Summary Judgment on Count I, for breach of contract.

## II.   Count III: Bad Faith

"[E]very contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement."  See Best Place, Inc. v. Penn America Ins. Co.,82 Haw. 120, 124, 920

P.2d 334, 338 (1996).  Defendant first argues that Plaintiff's

claim for breach of the implied covenant of good faith and fair

dealing is legally flawed and contrary to Hawaii law.  For

support, Defendant relies upon Parnar v. Americana Hotels, Inc.,

65 Haw. 370, 652 P.2d 625 (1982).  In Parnar, the Hawaii Supreme

Court declined to recognize a cause of action for bad-faith

termination of an at-will employment contract.  Id. at 377.  The

court explained:

> [T]o imply into each employment contract a duty to
> terminate in good faith would seem to subject each
> discharge to judicial incursions into the amorphous
> concept of bad faith.  We are not persuaded that
> protection of employees requires such an intrusion on the
> employment relationship or such an imposition on the
> courts.

Id.

Plaintiff asserts that his bad-faith claim is still

valid even in light of Parnar.  The Court agrees with Plaintiff.

Plaintiff draws attention to the Hawaii Supreme Court's

subsequent explanation of Parner in Best Place:  "Our holding in

Parnar, however, is limited to the at-will employment context,

and Hawaii continues to adhere to the general principle that, in

every contract, the law imposes on the parties a duty of good

faith and fair dealing."  Best Place, 82 Haw. at 125 n.5.  The

Court understands Plaintiff to be asserting a breach of the

implied covenant of good faith and fair dealing with respect to

the Letter Agreement, not his termination.  This claim is still

legally valid given the court's affirmation in <u>Best Place</u> that
the implied covenant of good faith and fair dealing exists in
every contract.  The <u>Parnar</u> decision would only bar Plaintiff's
claim if Plaintiff was asserting a claim for bad-faith
termination.

Defendant next argues that even if Plaintiff's bad-
faith claim is legally valid, it must nevertheless be dismissed
because his claim for breach of contract claim is unsustainable.
This argument fails because the Court has concluded that
Plaintiff's breach of contract claim survives.

Finally, Defendant argued at the hearing that
Plaintiff's bad-faith claim must fail because Plaintiff's
allegations of bad faith are only aimed at the circumstances of
his termination.  Specifically, Plaintiff offered his own
deposition testimony:

> I think they treated me like crap.  I mean, they walked
> into my office one day with no reason other than to say:
> You're fired.
> And I asked countless times why, and I was told: I can't
> tell you why.  And here's your money, and that's all you
> get.  And see you.  And clean out your office today.

Kosmin Depo. at 80.  The Court agrees that this particular
testimony does not support Plaintiff's claim for breach of the
implied covenant of good faith and fair dealing.  Plaintiff
acknowledged at the hearing he is not pursuing a claim for bad-
faith termination.  However, the Court finds that the same
genuine issues of fact that exist for Plaintiff's breach of

contract claim also preclude summary judgment on his bad-faith claim.  Construing all facts in Plaintiff's favor, the Court concludes that Defendant's refusal to pay post-employment overrides could be viewed as an action that deprived Plaintiff of the benefits of the Letter Agreement.  See Best Place, 83 Haw. at 124.  Specifically, Plaintiff has sufficiently alleged that Defendant deprived him of the benefits of the Letter Agreement by demonstrating genuine issues of material fact relating to the subsequent modification of the Letter Agreement and the time when override payments vest.

Accordingly, the Court denies Defendant's Motion for Summary Judgment with respect to Count III, for bad faith.

### CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment as it relates to Plaintiff's remaining claims for breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count III).

As to Count I, the Court finds that there are genuine issues of material fact as to whether the Letter Agreement was modified by the subsequent practice of the parties.  Further, the Court concludes that there are genuine issues of material fact as to when Plaintiff's right to share in the override commissions vests.

As to Count III, the Court finds that Plaintiff's claim

23

for breach of the implied covenant of good faith and fair dealing is valid as it relates to the Letter Agreement, in light of the Hawaii Supreme Court's affirmation in <u>Best Place</u>.  The same genuine issues of material facts that preclude summary judgment on Plaintiff's breach of contract claim also bar summary judgment on Plaintiff's bad-faith claim.  Plaintiff has demonstrated that there are genuine issues of material fact as to whether Defendant's actions deprived Plaintiff of the benefits of the Letter Agreement.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 31, 2008.

_____
Alan C. Kay
Sr. United States District Judge



<u>Kosmin v. Centex Homes, et al.</u>, Civ. No. 07-00059 ACK-LEK, Order Denying Defendant's Motion for Summary Judgment.